# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**ROXANNE FITCH, ET AL**                                    **CIVIL ACTION**

**VERSUS**                                                  **NO. 06-3235**

**SETTOON TOWING, LLC, ET AL**                              **SECTION "C" (2)**

## ORDER AND REASONS

After a bench trial in this matter, conducted on February 11-12, 2008, the Court made certain findings of fact concerning the causation of the damage that resulted in leaking in the "Lady Taylor," the reasonableness of certain decisions and actions made by Clarence Fitch with regards to the vessel after the allision, and causation of injury to Roxanne Fitch related to the incident.

The Court deferred making findings on certain questions, including whether Mr. Fitch's actions after he brought the vessel to Bobtown constituted an unreasonable failure to mitigate, the value of the vessel after the incident and the amount of damages, if any, that should be awarded. The Court also deferred a determination of the extent and value of the injury sustained by Mrs. Fitch as a result of the allision, including whether her injuries warrant lumbar surgery. The Court ordered that all supplemental briefing should be filed into the record by 5:00 p.m. on

March 10, 2008, and specifically requested additional briefing on the difference in the damages sustained by Roxanne Fitch in the event she underwent the surgery versus her damages without surgical intervention.

At trial, the defense rested, subject to the specific addition of the deposition of one of the defendant's witnesses, Dr. Donner, who was unable to testify at trial.  *See* Rec. Doc. 43.  His deposition was scheduled to take place on February 25, 2008.   The Court took the matter under submission after it ruled on the issues above, again, subject to the filing of Dr. Donner's deposition and supplemental briefing.

As a preliminary matter, the defendant filed a motion on March 3, 2008, for leave to file additional surveillance of Mrs. Fitch, taken after the trial in this matter between February 15 and February 23, 2008.  Rec. Doc. 46.  The plaintiff opposes the motion.  Rec. Doc. 45.  The Court notes again that the defense rested subject to the submission of the deposition of one witness who was unable to testify at trial, and the record did not otherwise remain open to new evidence. The plaintiff opposes the supplementation as fraught with evidentiary and procedural issues. Briefly, plaintiff argues that such evidence is not self-authenticating, that FED.R.EVID. 608 provides no mechanism for introducing such impeachment evidence post-trial, and that because there is no proper way to admit and authenticate such evidence post-trial, the defendant instead appears to be attempting to improperly prejudice the Court.  The defendant argues that the evidence is admissible not only for impeachment purposes, but for substantive purposes as well, in that it is probative of the nature and extent of Mrs. Fitch's injuries.  The defendant cites two cases for the proposition that the Court may, in the sound exercise of its discretion, when it

2

deems it necessary in the interests of justice, reopen the trial for the taking of new evidence, where it has not yet rendered its final decision.  *Caracci v. Brother International Sewing Machine Corp. of Louisiana,* 222 F.Supp. 769 (E.D.La. 1963); *Schick Dryshaver v. General Shaver Corp.*, 26 F.Supp. 190 (D.C.Conn. 1938).  The defendant also cites a Louisiana appellate decision upholding a trial court's admission of surveillance video made by the defense during trial that showed the plaintiff moving her head in a manner she claimed she could not.  *Detillier v. Smith*, 638 So.2d 445 (La.App. 5 Cir. 5/31/94).  In response to plaintiff's argument that the surveillance is impeachment evidence and thus inadmissible at this stage of the proceedings, the defendant cites *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513 (5th Cir. 1993).  Defendant argues that *Chiasson*, "the controlling Fifth Circuit case on this issue clearly states that surveillance of a personal injury claimant's daily activities is substantive evidence of the severity of the plaintiff's pain and the extent to which she had lost enjoyment of normal activities, which were key issues for a jury in calculating her damages."  Rec. Doc. 53, at 4.

The Court does not question the defendant's reading of *Chiasson*, but only the implications its holding has for the present case.  The *Chiasson* court indeed found that the surveillance at issue was not only impeachment evidence, but substantive evidence as well.  However, as a result of that determination, the court concluded that the evidence (which had not been disclosed pre-trial), should have been discovered, disclosed and listed pre-trial such that the opposing party had notice and a chance to prepare in light of such evidence, pursuant to the general discovery rule, FED.R.CIV.P. 26.  As a result, the court found that such evidence should not have been admitted, and actually vacated and remanded for a new trial because it had been

admitted.

Although the factual circumstance is different - the surveillance in *Chiasson* was performed and undisclosed pretrial -  that opinion decidedly does not support defendant's argument that the surveillance evidence it proffers should be admitted *because* it is substantive evidence.  Thus it is unclear under the law cited by the parties whether the Court does have the discretion to admit such evidence, admittedly substantive, at this time.  However, it is clear that the Court has the discretion not to admit it.  Because the defendant rested, and the Court took the matter under submission, subject only to the understood later submission of Dr. Donner's deposition, the Court finds it inappropriate to admit the additional surveillance.  Accordingly, defendant's motion is DENIED.  Rec. Doc. 46.  However, the Court notes that it has preliminarily reviewed the additional surveillance, and such evidence would not alter the Court's findings and opinion in this matter.  The *Chiasson* court stated, in reflecting on the surveillance evidence at issue in that case, that "it requires quite a leap to conclude that because [plaintiff] engages in routine activities, ergo, she does so without pain." 988 F.2d at 517.  That sentiment is applicable here, as well.

In addition, the Court notes for the record that it is disregarding the testimony of witness Antoine "Minor" Trahan in its entirety.  Defendant sought to introduce his testimony in light of a prior recorded statement.  Such statements, if offered as substantive evidence, are hearsay, and do not meet any hearsay exception, and do not qualify as "prior inconsistent statements" that are "not hearsay" under FED.R.EVID. 801(d)(1)(A), because the prior statements were not given under oath at a prior proceeding.  They could only admitted for impeachment purposes, to attack

4

the witness' credibility.  However, the only testimony that Mr. Trahan offered at trial was that the boat was in good condition to go to work and that he does not know anything about the case. Such testimony can be impeached by the prior statements, but can not act as substantive evidence that the converse is true.  Also, because this witness' testimony is not necessary to meet the plaintiffs burden in this case, the Court disregards his testimony in its entirety.

<u>REVIEW OF THE EVIDENCE AND ADDITIONAL FINDINGS OF FACT</u>

In its prior ruling, the Court found that when the barge struck the Lady Taylor, it caused Roxanne Fitch to fall and then jump from the boat, resulting in her injury.  Roxanne Fitch, aged 44, worked year-round as a cashier for a number of years prior to the incident, and would take her two weeks of vacation each year to help Clarence Fitch on his boat during the May and August shrimping seasons.  Her job at a local convenience store consisted of standing for long periods of time behind the cash register, and stocking the shelves, all for $7.50 an hour.

Mrs. Fitch testified that after she fell attempting to escape the Lady Taylor, she jumped several feet from the vessel to the dock - landing on her feet with her hands on the ground. When she got up, she could not move, and knew "immediately something was wrong" with her back.  It felt like something was out of place, and she experienced a horrible pain in her lower back, a pain which she had never experienced before.  She indicated to her husband that something was wrong and she had to go to the hospital, and they went to Chabert Medical Center in Houma, La.  Her emergency room doctor indicated she likely had pulled a muscle and prescribed pain medications and muscle relaxers.  She felt no better a week later, and sought

5

further medical care with Dr. Morteza Shamsnia.  She testified that most of her pain was in her lower back, with discomfort in her shoulders.

Mrs. Fitch testified that since the incident she has been unable to work.  She liked her job, the people there, and getting out of the house.  Before the incident, she would cut the grass, which is now her husband's job.  She has had to discontinue her long practice of going dancing with her husband, and her intimate relationship with him has been affected.  Mrs. Fitch testified that her youngest daughter, aged nineteen, had wanted to move out, but has remained at home to help her out since the injury.   Her interactions with her grandchildren have been affected.  For example, she is unable to watch one granddaughter's cheerleading team because she can not bear to sit on the benches for long periods of time.  She is unable to hold them and pick them up for long periods of time.  When she overdoes it, she testified, she suffers at night.

On May 23, 2006, soon after the accident Mrs. Fitch was evaluated by Dr. Shamsnia, a neurologist, to whom she complaiined of low back pain and neck pains. He testified that her spine looks older than her age would suggest, and while she may have some underlying structural degeneration, such degeneration alone would not cause the large disc herniation she has in her L5-S1 disc.  Dr. Bradley J. Bartholomew, a neurosurgeon, indicated that the MRI scan showed what was most likely some degenerative changes to both the lumbar and surgical areas. Defendant's medical witness, Dr. Christopher Cenac, an orthopedic surgeon, testified that he examined Mrs. Fitch on one occasion in November of 2006.  He testified that his physical examination revealed normal neurological and mechanical findings, and exaggerated pain responses, and no objective evidence of orthopedic mechanical dysfunction.  He reviewed

6

cervical and lumbar ex-rays that revealed multilevel degenerative disease, hard disc pathology

and no soft disc pathology, all of which he believed was long-standing and preexisting the

incident.   Dr. Cernac also testified that medical records from the Chabert Medical Center in

Houma, La, contradicted Mrs. Fitch's denials of any prior problems with her back or neck, which

she had made when she went to the emergency room immediately after the incident and

thereafter.  Dr. Cernac also testified that Mrs. Fitch's spine was the equivalent of someone in

their mid-60s.

On May 23, 3006, Dr. Shamsnia performed a neurological examination of Mrs. Fitch,

and found she had muscle spasms in the lumosacral region with loss of lordosis, the normal

curvature of the spine, both objective findings.  He performed diagnostic testing of Mrs. Fitch,

which included an upright MRI and an EMG/nerve condition study.  Dr. Shamsnia testified that

the MRI films and results were "very self-evident," showing a  large disc herniation at L5-S1, a

disc herniation at L4-L5, and bulging at L3-L4 her lumbar spine, two disc herniations in the

cervical spine, and a focal disc hernation in the thoracic spine.[1]  Dr. Shamsnia discussed the

options for treatment with Mrs. Fitch, including surgery.  When he examined her again on June

7, 2006, she continued to show spasms in her lower back with loss of lordosis.  He later

performed an EMG/nerve study, which showed the most abnormal area in the patient's back to

be her L5-S1 disc.  Dr. Shamsnia testified that, in looking at her film, it's "very obvious that she

has a large disc and it's pressing on the nerve.  So it's kind of a clear cut case."  He testified that

---

[1] Dr. Shamsnia teestified that the upright MRI utilized in this case reveals more pathology in comparison to a traditional, "lying down," MRI.

her MRI, which is an anatomical test, was consistent with her EMG and nerve conduction studies, which test physiology.  Dr. Shamsnia testified that the herniated disc and nerve impingement are the cause for the pain Mrs. Fitch complains of, and for such large a disc hernation in the L5-S1 in particular, some triggering event must have occurred.

Dr. Shamsnia prescribed Vicodin to manage Mrs. Fitch's pain symptoms, which contains Tylenol, toxic to one's liver, and hydrocodone, a habit-forming compound of narcotics, and Flexeril, an antimuscle spasm medication, that causes patients to be groggy, sleepy, and tired during the day.  Mrs. Fitch testified that the medications never gave her significant relief.  For example, she could still wake up from a "dead sleep" with muscle spasms.  She further testified that the medications caused her to feel like she was in a daze, light-headed and sleepy, and tired. In April of 2007, Mrs. Fitch complained of difficulty sleeping because of increased pain.  Dr. Shamsnia discussed the possibility that she may have had sleep apnea, and warned her that people with sleep disorders that take muscle relaxants and pain medications may have increased and potentially lethal side effects.  At her next examination on July 11, 2007, Mrs. Fitch stated to Dr. Shamsnia that she had stopped taking the medications because of the concerns he had raised about the interaction of her sleeping trouble and the medications.  However, she was still in pain and said she wanted relief, so she restarted the medication.  Dr. Bartholomew estimated that Mrs. Fitch's pain was approximately 80% back pain, and 20 % neck pain.

After his evaluation on November 9, 2006, Dr. Cernac concluded that Mrs. Fitch had long since reached maximum medical improvement and  was not a candidate for invasive surgery, and disgreed with the assessments of the plaintiff's neurologist, Dr. Shamsnia.  He

believed that her diagnostic tests, along with her prior medical history, indicated that the allision had caused a temporary aggravation of a preexisting condition in the lumbar spine.

Neurosurgeon Dr. Thomas Donner, defendant's other medical witness, testified via videotape deposition on February 25, 2008.  He testified that he had examined her on one occasion in November of 2007, and believed the lumbar MRI studies of Mrs. Fitch's back revealed a great deal of degenerative change with three lower disc spaces, and that there was nothing that would indicate acute trauma.  He found circumferential bulging, but not herniations. He concluded that the conditions present in the MRI indicated a preexisting condition.  He found no objective evidence of spasm, but conceded that a patient could have subjective pain and not have spasm.  He also testified that Mrs. Fitch exhibited a normal gait when he observed her walking outside his clinic after his examination, which was inconsistent with her behavior in his office.  Dr. Donner stated that Mrs. Fitch had reached maximum medical improvement when he examined her in November of 2007.

Dr. Shamsnia or Dr. Bartholomew referred Mrs. Fitch to Dr. Bordelon, a doctor of chiropracty.  At an initial examination, at which Dr. Bordelon made what he testified were objective findings of muscle spasm and decreased range of motion, Mrs. Fitch reported a pain level of eight out of ten.  He examined and treated Mrs. Fitch with three sessions of physical therapy a week for approximately one month, in the fall of 2007.  Mrs. Fitch testified that while she was doing the treatments, which included having somebody "rub [her] down," they felt good, but the relief never lasted.  During her treatment, Dr. Bordelon testified that Mrs. Fitch felt some relief from the therapy.  She reported pain ratings of four out of ten after many of the visits.

9

However, he testified that she did not get lasting relief from the therapy because every time she would come in she was in pain, would get some relief from the therapy, and then report the same pain when she returned.  When confronted with the significantly lower pain ratings she had indicated at many of the therapy sessions, Mrs. Fitch agreed that "it felt good.  I can't deny it felt good."  She further stated that she "couldn't tell you my back was better, but it eased up the pain, you know, while it's being done, it felt better ... there was no change in my condition."  Dr. Shamsnia testified that when he examined Mrs. Fitch in October of 2007, while she was getting physical therapy, she had some improvement in her symptoms.  The defendant raised the fact that Mrs. Fitch had not promptly begun physical therapy in October of 2006, after either Dr. Shamsnia or Dr. Pribil (a neurosurgeon she consulted with initially, who subsequently moved away) recommended it.  However, Dr. Shamsnia testified that in a case like Mrs. Fitch's, while physical therapy may help the patient have some relief from pain and discomfort, it does not change the course of the patient's outcome, and would not have changed the fact of the disc herniations or nerve injuries.  That is, she may feel relief as a result of the physical therapy while she is getting it, but the symptoms will return once she stopped.  Dr. Bartholomew stated that while prompt therapy after an injury could help a patient recover more quickly if he or she is going to recover, he would not expect a significant reduction in Mrs. Fitch's symptoms unless she engaged in physical therapy for the rest of her life.  Finally, Dr. Bordelon examined Mrs. Fitch on February 8, the Friday before trial.[2]  Mrs. Fitch still had spasms in the lumbar spine,

---

[2] The defendant objected at trial to the introduction of any testimony related to this "eleventh-hour" examination, because it had not received the report from the examination until the day of trial.  It appears that Dr. Bordelon, who had never testified in court before, recalled the patient on his own initiative, and not at the request of plaintiff's counsel, so that he could "give...an accurate testimony today."  Although apparently Dr. Bordelon notified

tenderness in the spine, a decreased range of motion and reduced range of rotation in her cervical spine.  His examination led him to believe that she would have failed further conservative therapy.

Dr. Shamsnia testified that surgery will not fix Mrs. Fitch's pinched nerves, and that she may still have pain after surgery is performed.  However, he stated that she will eventually need surgery on her lumbar spine, because the L5-S1 disc herniation is significant.  He referred Mrs. Fitch to a neurosurgeon, Dr. Bradley J. Bartholomew, who examined her on August 9, 2007.  Dr. Bartholomew found that straight leg testing produced back pain in Mrs. Fitch, and her neck exam produced trapezius spasms on both sides with tenderness.  In addition, there was

plaintiff's counsel that he was going to examine the patient on the day of the examination, she also did not receive his report until the morning he testified.  The Court asked the defense counsel what was the resulting prejudice to defendant, and was told that they were unprepared to fully cross-examine the doctor as a result of the late notice, and had no opportunity to consult with their medical experts concerning the contents of his report.  The Court offered the defense a break in which to review the report.  Plaintiff's counsel noted that the defense had never deposed Dr. Bordelon after his initial treatment of Mrs. Fitch.  The Court deferred ruling on the motion at trial.  The plaintiff notes that Dr. Bordelon is one of Mrs. Fitch's treating physicians and as such need not submit an expert report under FED.R.CIV.P 26, and points to *Knorr v. Dillard's Store Services, Inc.*, 2005 WL 2060905 (E.D.La. Aug. 22, 2005)(Vance, J.) ("A treating physician may testify to his opinions about a plaintiff's injuries if his testimony is based on knowledge acquired during the course of his treatment of the plaintiff ... A written report is therefore not required for a treating physician whose testimony and opinions derive from information learned during actual treatment of the patient, rather than from subsequent evaluation as a specially retained expert")  The Court notes that Dr. Donner was  asked about Dr. Bordelon's findings from the February 8 examination in the form of a hypothetical, and stated that it would not change his testimony.  While Dr. Bordelon's late-hour examination is unusual, it appears to be based on the sincere desire to both provide the best treatment to Mrs. Fitch, and the most accurate testimony to the Court, and the Court discerns no significant prejudice to the defendant here.  The Court finds that in this case the testimony from all of the witnesses regarding Dr. Bordelon's last examination aids in the search for the full truth.  As such, the Court rules that the testimony concerning the examination of February 8, 2008 is admissible.  However, the testimony concerning the February 8 examination is not essential to the Court's rulings in this matter.  As to the defendant's argument that without Dr. Bordelon's testimony concerning his eleventh-hour examination, there would be no evidence to support plaintiff's claim that lumbar fusion surgery is medically necessary at this time, the Court disagrees.  This argument appears to stem from an erroneous understanding of the reports of Mrs. Fitch's pain scale ratings from Dr. Bordelon's Fall 2007 treatment, which misunderstanding may have been alleviated had the defendants deposed Dr. Bordelon at any point prior to trial.  Dr. Bordelon testified that she only received temporary relief after each session, and Dr. Bartholomew testified that he recognized that the lower pain ratings reflected temporary relief.  Dr. Bordelon's February 8, 2008 examination confirmed, rather than contradicted, the report from his earlier treatment of Mrs. Fitch, as he testified that she received no lasting relief from that treatment.

tenderness in both sides over the lower lumbar area. He also examined the diagnostic studies that

Dr. Shamsnia had conducted, and confirmed that they showed herniation at L5-S1, and other

lumbar herniations and bulging, as well as a herniated discs in the cervical spine. He found that

the diagnostic studies were consistent with his own findings, and with Mrs. Fitch's complaints.

Dr. Bartholomew discussed different options, including surgery, but recommended trying

physical therapy first. He also discussed the possibility of steroid injections, but testified that

such injections do not give significant lasting relief. The steroids are like any medicine in that

they wear off. The surgical alternatives included a lumbar fusion at the L5-S1 and L4-L5 discs,

and a two level anterior cervical fusion. Dr. Bartholomew examined Mrs. Fitch again on

November 6, 2007, after she had been in therapy with Dr. Bordelon for about a month, and she

indicated she had no lasting relief from the therapy. His findings in this examination were

consistent with his prior examination. However, he also stated that at the time of his second

examination, he understood that Mrs. Fitch had shown a thirty to forty percent reduction in pain

ratings from her physical therapy, and would recommend continuing with such therapy before

performing surgery based on that understanding. Dr. Bartholomew stated that he would still

offer surgery for Mrs. Fitch if she her pain was still rating eight out of ten, but would recommend

repeating the MRI first. He testified that surgery is not absolutely necessary, but based on her

MRI and complaints, it is probably the "best option" to treat her pain. Dr. Donner testified that

he would not operate on Mrs. Fitch, because it would not bring about symptom resolution, and

may cause her to experience more pain. He also testified that if Mrs. Fitch had shown

improvement after three or four weeks of physical therapy of approximately fifty percent, he

12

would recommend further physical therapy, and that assuming Dr. Bordelon's testimony regarding her exam on February 8, 2008, it would have no bearing on his opinion as to whether she was a surgical candidate.

Mrs. Fitch testified that at this point, having experienced no permanent improvement with physical therapy, and no permanent relief from her medications, she is now definitely willing to undergo lumbar surgery.

Dr. Shamsnia testified that Mrs. Fitch said her low back pain is more severe than the neck pain, and that she probably does not need surgery on her cervical spine.  Dr. Cernac testified that Mrs. Fitch's records do not reflect any cervical complaints nor cervical injury at the time of the incident.

Dr. Cernac noted many instances of medical reports that indicated Mrs. Fitch had complained about back pain, prior to the indicent.  However, Mrs. Fitch explained to the Court's satisfaction that all prior reports of "back pain" related to a pulled muscle while she was six or seven months pregnant, almost twenty years prior to the incident, complaints of kidney pains related to kidney infection, and "flank pain" associated with what was eventually diagnosed as ovarian cysts.  She credibly testified that "lower back pain is different from having a kidney problem pain, and that the flank pain related to the cysts was a "totally different pain from the accident pain."

When confronted with surveillance that the defendant had conducted of Mr. and Mrs. Fitch, in which she is seen lifting and holding her 17-month old grandchild, Mrs. Fitch testified that she is not paralyzed, and she tries to do what she can.  Further she "pay[s] for whatever she

13

does during the day."  In another tape, she is seen pushing a cart going into a Wal-Mart store. She responded that she always pushes the cart, at any store she goes to, because she prefers holding on to it while she shops.  When confronted with the supposed inconsistency between her deposition, in which she stated that when she drives it gives her spasms in her back and the fact she drove to New Orleans to see Dr. Bartholomew, she testified that while it is painful to drive, she does in fact drive.  Defense counsel questioned how Mr. Fitch could have driven if the pain was so unbearable, she testified that the pain is the same regardless of whether she's driving or sitting in the passenger seat.

While the Court finds that Mrs. Fitch may have had some degeneration of her back preexisting the incident, the allision proximately caused acute injury to her back that resulted in severe pain which did not exist before the accident, as well as significant reductions in the activities she can engage in. The Court finds that there is no evidence of demonstrated prior lower back pain that was not related to the plaintiff's pregnancy, kidney pain, or ovarian cysts. Beyond the confirmation in the testimony of her doctors, the severity and reality of her pain is confirmed by the several other factors. The Court credits the testimony of the plaintiff that she remains in significant pain that was not present prior to the accident, and that she is unable to engage in a number of activities that she had before.   Despite her demonstrated fear of the potentially lethal side effects from the combination of her difficulty sleeping and her medications which Dr. Shamsnia warned her about, which caused her to discontinue her medications for a time, she restarted the medications after her pain became unbearable without the medications. Her daughter has remained at home to help out Mrs. Fitch, doing the cooking and cleaning,

14

despite desiring to move out.  The Court finds that the surveillance performed by the defendant does not demonstrate that Mrs. Fitch's injuries and limitations are inconsistent with her claims of significant and constant pain.  In consideration of all of the evidence at trial, the Court finds that the decreased pain ratings indicated during the course of Mrs. Fitch's physical therapy indicated the temporary relief she felt after each session, and that such relief was indeed only temporary. Despite the testimony of defendant's medical witnesses, the Court finds that conservative therapy has failed to significantly alleviate Mrs. Fitch's pain, and agrees with Dr. Shamsnia that the plaintiff will need lumbar surgery at some point, and with Dr. Bartholomew that it is her best option to treat her pain.  The Court finds that such surgery is necessary as result of defendant's actions, that is, it is proximately caused by the defendant.  The Court's ruling should not however, preclude the professional medical advice of Dr. Bartholomew, or any other doctor, that Mrs. Fitch have an additional MRI performed prior to any surgery.  While the Court finds that the injury caused Mrs. Fitch to have some limited pain in her neck and cervical spine, there is. no indication that surgery recommended.

After her accident, Mrs. Fitch quit her job as a cashier at a convenience store, where she earned $7.50 an hour.  Dr. Shamsnia testified that after her surgery, as her doctor, he would have a problem with her working in a job that required standing on her feet for eight hours, and regardless of the duration, that required her to unload boxes of twenty pounds or more. However, if she has a good outcome from surgery, she will be able to work sitting at a desk or chair, assist people, and engage in minor lifting of up to ten pounds.  Dr. Bartholomew indicated that after a lumbar fusion, Mrs. Fitch would likely experience a 14 - 18 % permanent restriction

in her activity.  He would recommend against repetitive lifting of over twenty-five pounds, or repetitive bending, stooping, crawling, twisting and turning.  Mrs. Fitch would not be able to stand at a job for the better part of eight hours per day without frequent ten to fifteen minute breaks.  Dr. Donner testified that Mrs. Fitch, from seeing Mrs. Fitch and reviewing her records, was capable of returning to her work as a cashier.  The Court finds that, while her injury and the recommended surgery will permanently limit her ability to work full time, Mrs. Fitch will be able to work part time at a job similar to the one she had prior to the accident.

Accordingly, Settoon Towing is responsible for the past medical bills of the plaintiff, the cost of the recommended surgery, past lost wages, future lost wages of half of her earning potential, and loss of enjoyment of life which Mrs. Fitch has experienced.

Damage to the Lady Taylor

The Court previously ruled that while the Lady Taylor was an old vessel, it was in working condition prior to being struck by the barge on May 3, 2006.  The Court found that, more likely than not, the impact of the barge against the vessel either compressed the vessel in such a way as to cause one or more fractures in the fiberglass along the seams, resulting in leakage, or jarred the fasteners so as to allow water to enter the vessel, and that either way, the impact caused the damage that caused the leak.  The Court also found that Mr. Fitch reasonably concluded that it would be better to return the vessel to the dock in Bobtown, where it had previously been, rather than attempt to make the 3 to 4 hour voyage, which involved going into the shipping channel, to a drydock that Settoon Towing had found at Main Iron Works.  The Court also found that while Settoon offered to provide more pumps, the pumps Mr. Fitch had at

16

that point were adequate to keep the vessel reasonably dry.  The Court deferred ruling as to

whether Mr. Fitch's actions subsequent to moving the vessel to Bobtown constituted a failure to

mitigate his damages and the value of the Lady Taylor.

On May 5, Mr. Fitch returned to Bobtown with the Lady Taylor, a trip he made without

difficulty, having hired someone to drive the boat so that he could watch the pump.  During the

course of the trip, John Verdin of Settoon Towing offered him additional pumps.  He declined

the offer, stating that he could manage with the pumps he had on the boat.  He put the boat up on

the shallow side of the dock, where the water was three to four feet deep.  The water on the other

side was very deep, and he was concerned in case he could not constantly "babysit" sit the boat.

He was operating two battery-powered 12-volt bilge pumps.  He plugged the boat's battery

charger into a light plant, to keep the batteries from dying.  He returned to the boat on the

morning of May 6 and the pumps were still running, and there was only a little bit of water on

the floor of the boat.  He would check on the boat each day, but one day he did not.  Mr. Fitch

received a phone call from a woman who lived across from the dock, who said the boat had sunk

when the tide had come up.  He testified that perhaps the battery had died.  After he observed the

sunken boat, he rented another larger pump.  His other pumps were useless because the battery

was underneath the water.  He applied a substance for the purpose of plugging some of the

cracks, and after five or six hours, he was able to get the boat completely pumped out and

floating.  He returned the rental pump, and again would visit the boat each day.  At that point,

Mr. Fitch testified he did not have the money to attempt to drydock the boat.  He did not contact

Settoon, or receive any communication from Settoon regarding further attempts to drydock the

17

boat or regarding pumps.  He contacted his friend, Donald Bourg, who had a drydock nearby, who told Mr. Fitch he would have let him pay later, after the shrimping season, but at that time Bourg had no place to pull the boat up. Bourg indicated that a space would be open one month later, and Mr. Fitch stated that he probably could have gotten it down there.  After that, Mr. Fitch testified that he left it where it was, partially aground at Bobtown, and "couldn't do nothing more."  Eventually he sold the motor out of his boat, after it had sunk, and it remained in that location at the time of trial.

Plaintiff's marine surveying expert, Phillip Earl Gilligan, examined the Lady Taylor on Feb 3, 2007, nine months after the incident.  He found sprawl fractures in the fiberglass, but was unable to look below the water line.  Gilligan testified that the visible damages he found were consistent with compression damage from the type of slide-siding accident that was described to him, and that there was probably a lot of popping and cracking of the framing and stringers, that is the skeletal structure of the boat, when it was struck. He testified that the cracking heard by the witnesses was consistent with the cracking of the internal members that he described.  He wanted to remove some of the interior board system, but after seeing the way the vessel had been compressed, he concluded it was not in his best interest because removing them could have allowed the vessel to come apart.  He testified that the absence of paint in the fractures he identified, suggested the fractures were new and recent in nature (Clarence Fitch testified that he painted the boat in preparation for the shrimping season that year).  He did not feel it was safe to move the vessel from where it was at the dock at Bobtown. Gilligan testified that the probability was great that it would sink, and create a pollution problem and a hindrance to navigation; it was

18

not prudent to take the vessel into the waterway.  On cross-examination, Gilligan testified that

while the boat was not under any stress in its situation partially sunk at the dock at Bobtown,

such a situation had caused deterioration.  He disagreed with defendant's expert and testified that

the boat does not have to be in water to maintain its shape.

Defendant's marine surveying expert, Daniel McCloy, Jr., examined the Lady Taylor on

May 30, 2006.  He testified that fiberglass such as that over the hull of the boat, which was built

in 1955, may indicate that the boat had problems with the fasteners (where the ribs are connected

together), rotted framing, and leaking.  He testified that an older shrimping boat like the Lady

Taylor may have an expected useful life of up to ten years.  He found no evidence of

compression damage and disagreed with Gilligan's conclusion; he thought the boat had fractures

not consistent with compression, but rather problems with fasteners and rotted framing in the

hull that he considered to be preexisting the collision.  He was unable to really see anything

under the water, so was unable to fully identify the source of the leaking.  When McCloy

examined the boat, Mr. Fitch said he would get back to him on drydocking the boat, and

anticipated a complete inspection when the boat was drydocked.  He testified that at the time he

saw the boat, it could easily have made it from the Anchor Ice House to Main Ironworks, or

anywhere else, with proper pumping.  In November or December the defendant contacted

McCloy to once again attempt to arrange for drydocking of the vessel.  After some difficulty, he

found an opening at another drydock and arranged to tow the boat on January 15, 2008.  After

pumping the boat try, he stopped to see how fast the water was rising in the vessel.  The water

level rose rapidly, such that he considered it too dangerous to attempt to move the vessel, and he

called off the drydocking.  He considered that the condition of the boat, sitting hard aground with

no water pressure to aid in supporting the hull, had deteriorated since he had first examined the

boat.  On cross-examination, he testified that it was "very possible" that the bad fasteners and

damage to the bulwarks was preexisting the collision, and that he had no evidence that the boat

had any problems being used as a fishing vessel or was leaking prior to the collision. He said he

had no way of knowing, because he had never seen it drydocked.  He could not rule out the

existence of a fracture caused by the incident below the waterline for the same reason.  While he

testified that he found no evidence of compression damage, he also testified that a barge striking

the boat could have jarred the fasteners looser. McCloy testified that the testimony of the other

witnesses to the significant cracking noise they heard when the barge struck the tow did not alter

his opinion about whether the barge had suffered compression damage, or about the cause of the

leak in the vessel, although he did testify that the cracking sounds would not have come from the

steel barge.  However, he gave no testimony as to what the source of the cracking sounds could

have otherwise been.

Gilligan testified that, nine months after the collision, it would have been too dangerous

to try to tow the Lady Taylor to someplace in order to drydock it, because it might sink.  He

testified that the alternative to towing would have been to either secure the boat between two

small barges, or to get a cherry picker or a crane to come and move it down the bank a little

farther, lift is up and actually set it on the bank in the area.  There was no testimony or other

evidence as to how much this would cost.

McCloy testified that his valuation of what the Lady Taylor was worth at the time of the

incident was $25,000.  Gilligan testified that at the time he examined the vessel, he valued the

vessel at the value of its component parts: $0 for the hull, $7500 or best offer for the engine,

$1000 or best offer for the reduction gear, of unknown condition because it had been underwater,

and $550 for the electronics, for a total of $9,050.  He testified that the vessel could have had a

maximum value, capped and in great condition, of $42,000 in a strong market (which he testified

it was not at the time).  However, he gave a rough estimate of $22,000 to $28,000 maximum,

with the particular engine it had, for the value of the Lady Taylor itself prior to the incident.

 The Court previously found that at the time Settoon offered Mr. Fitch the additional

pumps, he reasonably believed he had enough pumping capacity to maintain the condition of his

boat, and that it was not an unreasonable failure to mitigate for him to decline the offer.  The

Court finds that the failure of his pumps was accidental, and not a proximate contributory cause

of the sinking of the boat.  The Court finds that the leaking of the Lady Taylor caused by the

impact of the barge proximately caused it to sink.  The Court finds that at some point between

when the boat sank and when Gilligan examined it on February 3, 2007, the boat became too

dangerous to attempt to move the vessel from the dock where it was at Bobtown, and it is not

absolutely clear whether that point occurred prior to the point at which drydocking at Bourg

Marine became possible.  The Court finds that some, but not all, of damage to the barge was

caused by Mr. Fitch's unreasonable failure to mitigate his damages by attempting to drydock at

Bourg marine.

 McCloy valued the vessel at the time of the incident at $25,000. Gilligan gave a rough

estimate of $22,000 to $28,000 at the time of the incident, which is consistent with McCloy's

estimate.  Accordingly, the Court finds the value of the Lady Taylor prior to being struck by the

barge to have been $25,000.  Gilligan estimated the value of the reduction gear and electronics

together in February of 2007 at $1550, and Fitch was able to sell the main engine for $4000.

Thus, the Court measures the loss to the vessel from the collision at $19,450.  However, the

Court finds that half of that amount is attributable to deterioration from Mr. Fitch's failure to

mitigate by attempting to drydock the boat at Bourg Marine, after the boat had sunk.


CONCLUSION

For the reasons stated above,

IT IS ORDERED THAT the plaintiff is entitled to $9,725 for the damage to the Lady

Taylor; $27,738 in past wage loss for Mrs. Fitch; $100,000 in future wage loss for Mrs. Fitch;

$15,246.18 in past medical expenses;  $109,850 for the cost of surgery - contingent on the

surgery being performed; and $235,000 in general damages.  Furthermore, the plaintiff is entitled

to post-judgment interest at the judicial rate from the date of judgment until damages have been

paid on all damages except for the cost of surgery.  The plaintiff is entitled to post-judgment

interest at the judicial rate from the date the surgery is performed, if it is performed, until such

damages have been paid.

New Orleans, Louisiana, this 17th day of April, 2008.


_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE